

2013CI18394 –D224

## CAUSE NO. 2013-CI-18394

| | | |
|---|---|---|
| IN RE: A PURPORTED | § | IN THE DISTRICT COURT |
| | § | |
| LIEN OR CLAIM AGAINST | § | BEXAR COUNTY, TEXAS |
| | § | |
| HELVETIA ASSET RECOVERY, INC. | § | 224TH JUDICIAL DISTRICT |

## FINAL JUDGMENT AND ORDER OF SANCTIONS

On March 3 and 4, 2014 came to be heard the First Amended Motion for Sanctions filed by Movants Puerto Verde, Ltd. ("Puerto Verde") and Helvetia Asset Recovery, Inc. (collectively, "Helvetia") against Respondents Burton Kahn ("Mr. Kahn") and his attorney L. Terry George ("Mr. George") (the "Sanctions Motion"). Mr. Kahn represented himself pro se at this evidentiary hearing. Mr. George did not appear.[1]

The Court, having reviewed the Sanctions Motion, Mr. Kahn's response, testimony and other evidence presented, including the Temporary Injunction record in Cause No. 2013-CI-18355, argument from counsel and Mr. Kahn, and having taken judicial notice of the parties' pleadings and filings in related litigation Cause No. 2013-CI-18355, enters the following Final Judgment and Order of Sanctions:[2]

## I.
### FINDINGS AND CONCLUSIONS

**A.    Background.**

1.    Helvetia seeks sanctions under (1) Rule 13 of the Texas Rules of Civil Procedure; (2) Chapter 10 of the Texas Civil Practice & Remedies Code, Section 51.903 of the Texas Government Code; and (3) through the Court's inherent power to sanction litigants and their

---

[1] Reporter's Record, Volume 1 (RR-1), pp. 1-4.

[2] RR-2, p. 55.

Document
scanned as filed.

Page 1 of 29

EXHIBIT 2

counsel.[3]  Section 51.903 permits, *inter alia*, an owner of real property to appear before a court and have the court declare as fraudulent an instrument filed of record creating or purporting to create an interest in real property owned by the movant.  The owner/movant "may" appear *ex parte*.  The reviewing court may not consider testimony or make findings on the merits.[4]

2.      The offending pleading that is the subject of the Sanctions Motion is an *ex parte* motion (the "*Ex Parte* Motion") filed on November 5, 2013 by Mr. Kahn in the name of Helvetia.[5]  This *Ex Parte* Motion was filed pursuant to Section 51.903 of the Texas Government Code.  Mr. George was designated as Mr. Kahn's lead counsel on the *Ex Parte* Motion. [6]  Newly-retained Jay Petterson in San Antonio ("Mr. Petterson") was designated as "associate attorney," and signed the document for Mr. George, who resides in Fort Worth, Texas.[7]

3.      As described in more detail in this Judgment and Order, the Court finds that Mr. Kahn and Mr. George committed a fraud on the court and on the Movants for the malicious purposes of claiming ownership by Kahn of Helvetia, and of clouding legal title to land owned by Helvetia and sold by Helvetia to a *bona fide* purchaser for value.  One day before the Respondents filed and presented the *Ex Parte* Motion, Helvetia had filed a Petition and Application for Temporary Restraining Order in Cause No. 2013-CI-18355 seeking to enjoin Mr. Kahn from interfering with Helvetia's business or holding himself out as an authorized representative of Helvetia.

---

[3] First Amended Motion for Sanctions, filed January 15, 2014, pp. 5; *See also*, *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997).

[4] TEX. GOV'T CODE §§ 51.901, 51.903.

[5] *See* Exhibit 1.  The pleading was filed in the name of "Helvetia Asset Recovery, Inc."  The pleading was captioned "Motion for Judicial Review of Documentation or Instrument purporting to Create a Lien or Claim."

[6] Exhibit 1, p. 6; RR-4, p. 57.

[7] *Id.*

4.     While Helvetia's counsel was negotiating with Respondents to secure a hearing on Helvetia's Application for Temporary Restraining Order, the Respondents secretly filed and presented the *Ex Parte* Motion to a Bexar County judge and secured an order (the "*Ex Parte* Order") that was then filed in the Bexar County deed records to slander Helvetia's title and cloud its buyer's title.[8] Mr. Kahn had no authority to file a motion on behalf of, or in the name of Helvetia, and his motion was a totally fictitious pleading filed for the purpose of causing harm to others.[9]

5.     Jay Petterson, Mr. George's co-counsel who signed the motion on behalf of Mr. Kahn and Mr. George, later signed a Rule 11 Agreement whereby Mr. Kahn promised to petition the court to set aside the *Ex Parte* Order.[10] Mr. Kahn later disavowed the Rule 11 agreement, forcing Helvetia to try a lengthy temporary injunction hearing that resulted in a temporary injunction against Mr. Kahn and an order setting aside the *Ex Parte* Order, in other words, accomplishing at great cost what Mr. Kahn had earlier promised to do in his Rule 11 agreement.[11]

6.     Helvetia was incorporated by Puerto Verde in August 2007. Puerto Verde is a Bahamian corporation and is owned by Robert Ripley ("Mr. Ripley").[12] Puerto Verde contributed approximately $1.2 million in cash to capitalize Helvetia in 2007, using the funds to buy Helvetia's 1,000 shares of stock at $1 per share.[13] These 1,000 shares represented the total

---

[8] Exhibits 1, 2, 15-18; RR-3, pp. 23-27.

[9] RR-4, p. 32-37; RR-3, p. 27, 101-104.

[10] Rule 11 Agreement, attached as Exhibit B to Motion to Strike Jury Demand, filed January 10, 2014 in Cause No. 2013-CI-18355, a filing of which the Court has taken judicial notice; RR-2, p. 55; RR-4, p. 57.

[11] RR-3, pp. 100-105; Exhibit 3.

[12] Defendant's Exhibit 9: See Temporary Injunction Reporter's Record, Vol. 2 (TI-RR-2), at pp. 6-8.

[13] Defendant's Exhibit 9: TI-RR-2, pp. 9-20.

04/02/2014 VOL 4201 PG 3860

number of shares authorized by Helvetia's charter and incorporation documents.[14]  Helvetia used this capital contribution in 2007 to acquire 215 real estate lots in the Key Largo subdivision in San Antonio.[15]  Helvetia has already sold many of the lots to homebuilders.[16]  Sales of lots began in 2010, and have increased in subsequent years.[17]

       7.      Helvetia appointed Mr. Kahn in 2009 to oversee its lot sales and closings, for which he received a 3% commission.[18]  Mr. Kahn was the company's director and president from 2009 until Helvetia terminated him in August, 2013.[19]  Prior to 2009, Kenneth Moore served as president and director of Helvetia.[20]  Unhappy with his termination, Mr. Kahn set about to get even.  He emptied Helvetia's bank accounts, transferring approximately $300,000[21] into other bank accounts personally owned by Mr. Kahn or his companies.[22]  He then issued to himself on September 7, 2013, a stock certificate for 1,000 shares of Helvetia common stock and purported to cancel Helvetia's 2007 offer to sell its stock to Puerto Verde.[23]  Next Mr. Kahn signed and filed a warranty deed in the name of Helvetia that purported to convey the entire Key Largo subdivision to Paradiv Corporation ("Paradiv"), a corporation newly formed by

---

[14] *See* Exhibit G attached to Exhibit 1 (Helvetia Certificate of Formation For-Profit Corporation); Defendant's Exhibit 8: TI-RR-4, p. 33, 34.

[15] Exhibits 20-22, Defendant's Exhibit 9: TI-RR-2, pp. 10-20.

[16] Defendant's Exhibit 9:TI-RR-3, pp. 57-58.

[17] Defendant's Exhibit 9: TI-RR-3, 56-57.

[18] Defendant's Exhibit 9: TI-RR-Excerpts, pp. 63-68; Defendant's Exhibit 8: TI-RR-4, p. 123-124; Defendant's Exhibit 9: TI-RR-3, pp. 57, 61.

[19] Defendant's Exhibit 9: TI-RR-4, p. 17; TI-RR-3, p. 43.

[20] Defendant's Exhibit 9: TI-RR-2, pp. 20-26, 33-35; Exhibit 8: TI-RR-4, p. 17.

[21] Mr. Kahn testified that "300 some odd thousand dollars" was transferred from Helvetia to his accounts.  The Court's finding is based on this testimony and is not intended to foreclose Helvetia from demonstrating at trial in Cause no. 2013-CI-18355 that more was in fact transferred into his accounts. RR-3, pp. 43-45.

[22] Defendant's Exhibit 8: TI-RR-4, pp. 38-42; Defendant's Exhibit 9: TI-RR-3, pp. 41-53, RR-3, pp. 38-50.

[23] Defendant's Exhibit 8: TI-RR-4, pp. 42-46; Defendant's Exhibit 9: TI-RR-3, pp. 18-19; Exhibit 4.

Mr. Kahn.[24]  Paradiv paid nothing for Key Largo, and the conveyance included all lots previously sold by Helvetia to others -- including lots which Mr. Kahn had personally closed and for which he had received his 3% commission.[25]  After the conveyance to Paradiv, Mr. Kahn filed his *Ex Parte* Motion to invalidate six recent sales made by Helvetia to a builder that Mr. Kahn also recently sued in a separate lawsuit in Bexar County.[26]

**B.    Mr. Kahn's Sophistication.**

8.    Mr. Kahn is well educated, graduating with an engineering degree from M.I.T.[27] He is employed as an engineer, and has owned and operated several engineering companies.[28]

9.    Mr. Kahn has represented himself pro se in numerous matters, both in district court and at the appellate level.[29]  His "practice" before the courts spans over twenty years, including multiple cases in Houston and San Antonio.[30]  Mr. Kahn is knowledgeable about liens and the sale of property.[31]  He knows how to cloud title to property and chill financing needed by builders.[32]  Mr. Kahn studies the law, performs legal research using Loislaw and O'Conner's, and is adept in using the internet.[33]  Mr. Kahn's son is a litigation attorney practicing in

---

[24] Exhibits 7 and 8; Defendant's Exhibit 9: TI-RR-3, pp. 43-46, 55-56; Defendant's Exhibit 8: TI-RR-4, pp. 46-47, 52-53.

[25] Defendant's Exhibit 8: TI-RR-Excerpts, pp. 47-48, 63-68; Defendant's Exhibit 8: TI-RR-4, p. 52-53, 123-124; Defendant's Exhibit 9: TI-RR-3, pp. 59-61.

[26] Defendant's Exhibit 8: TI-RR-Excerpts, pp. 63-68.

[27] RR-3, pp. 28-30; Defendant's Exhibit 8: TI-RR-4, p. 43.

[28] Defendant's Exhibit 9: TI-RR-4, p. 92-93; Exhibit 25, Exhibit 26 (Gillett); Exhibit 6 (Contour). Defendant's Exhibit 9: TI-RR-4, pp. 64-65 (Contour).

[29] RR-3, pp. 28-33, 60-66, 74-77, 79.

[30] *Id.*

[31] *Id; see also* RR-3, pp. 38; RR-4, pp. 57-62; Exhibits 26 and 27.

[32] *Id.*, see also, RR-3, p. 27.

[33] RR-3, p. 28-29.  Justice Michol O'Connor is a respected author of a series of books relating to litigation in Texas and federal court, including *O'Connor's Texas Rules *Civil Trials* and *O'Connor's Texas Causes of Action.*

The transcript does not reflect Mr. Kahn's reference to Loislaw; however, Helvetia counsel recalls this testimony. Loislaw is a subscription internet research service similar to Lexis or Westlaw.  See www.loislaw.com.

04/02/2014 VOL 4201 PG 3262

Houston.[34] Mr. Kahn has demonstrated in this case knowledge of legal terms and concepts used in and applicable to these proceedings.[35]

### C. Mr. Kahn's Claims.

10. Mr. Kahn and Mr. George filed a fictitious pleading in the name of Helvetia by filing the November 5, 2013 *Ex Parte* Motion.[36] Neither had authority to file the pleading.[37] Helvetia had fired Mr. Kahn in August 2013 and relieved him of duties long before Mr. Kahn filed the *Ex Parte* Motion.[38] His claim to authority stems from an alleged purchase of Helvetia's stock on September 7, 2013, but this claim is groundless.[39]

11. Mr. Kahn alleges that Helvetia's stock was available for him to purchase just days after he was fired in 2013 because Helvetia's stock had allegedly never been purchased by Puerto Verde, or anyone, since Helvetia's formation in 2007.[40] Mr. Kahn claims that an allegedly forged signature of Kenneth Moore, the then-president of Helvetia, on the 2007 stock certificate Helvetia delivered to Puerto Verde nullified Puerto Verde's rights to Helvetia's stock, and somehow implausibly caused Puerto Verde to forfeit its $1.2 million investment.[41] Mr. Kahn also advances the novel legal argument of stock forfeiture by typographical error.[42] Notwithstanding Puerto Verde's payment of over $1.2 million to Helvetia in 2007, Puerto Verde, according to Mr. Kahn, owns nothing because the stock certificate was issued in the name of

---

[34] Defendant's Exhibit 8: TI-RR-4, p. 43.

[35] *See*, e.g., RR-4, pp. 64-66, 68.

[36] Defendant's Exhibit 9: Exhibit 1.

[37] Defendant's Exhibit 8: TI-RR-4, p. 19. Mr. Kahn testified that Mr. Petterson did not have authority to sign the Rule 11 Agreement, "giving away everything we had worked very, very hard on this --- in rem case." RR-4, p. 38.

[38] TI-RR-3, pp. 38-41.

[39] RR-3, pp. 45-46.

[40] RR-3, pp. 45-56; Exhibits 5 and 6.

[41] *See* Exhibits 1, 4, 5; RR-3, pp. 90-94.

[42] Defendant's Exhibit 9: TI-RR-3, pp. 29-30, 92-94; Defendant's Exhibit 2.

04/02/2014 VOL 4201 PG 3263

"Puerto Verde, Inc.," not "Puerto Verde Ltd.," Puerto Verde's proper name.[43] Finally, Mr. Kahn

claims the infusion of $1.2 million by Puerto Verde was a loan, not a capital contribution, even

though there is no note or deed of trust, and even though his position is contrary to his own

sworn tax return for Helvetia for the year ending 2012, which shows no such liability.[44]

12.     Mr. Kahn's legal position as to his stock ownership is groundless. Texas has

adopted Article 8 of the Uniform Commercial Code, which governs the creation and transfer of

corporate securities. Under Article 8 complete ownership of a stock may exist without either the

issuance or delivery of a stock certificate. Texas common law is the same. For at least 100

years, Texas has not required a stock certificate as the *sine qua non* of ownership. [45]  What

controls the issue of ownership is whether stock was lawfully issued for purchase by the

shareholder and whether the shareholder in fact purchased the stock. The evidence here showed

that Helvetia issued its stock for purchase to Puerto Verde, and that Puerto Verde purchased the

stock.[46]

13.     Mr. Kahn knew Puerto Verde purchased Helvetia's stock in 2007, and he knew

that Puerto Verde's capital contribution enabled Helvetia to acquire the Key Largo subdivision.

Both Mr. Kahn and Mr. George had personal knowledge that Helvetia issued its stock to Puerto

Verde in 2007. They both actively participated in Helvetia's incorporation.[47]  Helvetia hired

---

[43] *Id.*

[44] Exhibit 6; *see* Schedule L, liabilities (lines 16-21); RR-4, p. 40-43, 48.

[45] *See In re Seminole Walls & Ceilings Corp.,* 446 B.R. 572, 585-86 (M.D. Fla. 2011 (applying Texas law); *Yeoman v. Galveston City Co.,* 106 Tex. 389, 167 S.W. 710, 720 (Tex. 1914).

[46] Exhibits 4, 5, 21, and 22. "[A] corporation may issue shares for consideration if authorized by the board of directors of the corporation." TEX. BUS. ORGS. Code § 21.157(a); *see also,* § 21.160. Shares may be issued by cash consideration. *Id.,* at § 21.159(2). When the consideration is paid, the shares are considered to be issued, and are fully paid and nonassessable. *Id.,* § 21.157. The judgment of either **the board of directors, or the shareholder is conclusive** in determining the value **and sufficiency of the consideration received for the shares.** *Id.,* § 21.162. (emphasis added).

[47] Defendant's Exhibit 5, including Exhibit 1 attached thereto (Robert Ripley's Affidavit), and Exhibit D attached thereto; Exhibit 19, 20; Defendant's Exhibit 8: TI-RR-5, pp. 4-6, 8, 18, 21-22.

04/02/2014 VOL 4201 PG 3264

Mr. George, who was Mr. Kahn's neighbor, to act as incorporator.[48] Mr. George prepared Helvetia's 2007 organizational minutes, which showed that Helvetia issued its1,000 shares of stock to Puerto Verde at $1 per share.[49] Puerto Verde wired approximately $1.2 million in cash in 2007 to capitalize Helvetia in exchange for all its shares, thus enabling Helvetia to purchase the Key Largo subdivision.[50] Mr. Kahn personally monitored and confirmed the 2007 wire transaction and the closing on Key Largo.[51]

14.    The organizational minutes, wiring instructions and confirmations, Helvetia's 2012 tax return signed by Mr. Kahn, the stock certificate itself, and Mr. Kahn's own communications between 2007 and September 2013 establish that Mr. Kahn knew his claim of ownership through a stock purchase in 2013 was groundless.[52]

15.    With regard to Mr. Kahn's claims that Mr. Moore's signature on the Puerto Verde stock certificate was forged, the Court finds this claim factually baseless and Mr. Kahn's conduct contrary to any reasonable investigation that should have been undertaken to ascertain the validity of a signature by an officer of a corporation. Mr. Moore confirmed his signature at the temporary injunction hearing.[53] Mr. Kahn failed to contact Mr. Moore who, like Mr. Kahn, lives in San Antonio, to ask him if his signature was valid.[54] Instead, Mr. Kahn used the internet to locate and interview a handwriting expert, Curtis Baggett ("Mr. Baggett").[55] Mr. Kahn secured and attached a report by Mr. Baggett to the Ex Parte Motion opining that Mr. Moore's signature

---

[48] Defendant's Exhibit 8: TI-RR-4, pp. 43-45; Defendant's Exhibit 9: TI-RR-3, pp. 54-55.

[49] Exhibit 19, 20.

[50] Exhibit 19, 21, 22.

[51] Exhibit 19.

[52] RR-4, pp. 38-48; Defendant's Exhibit 9: TI-RR-2, pp. 26-33; Exhibits 6, 19, 20, 21, 22, 23, 24, and 25.

[53] Defendant's Exhibit 8: TI-RR-4, pp. 129, 147-152.

[54] RR-3, pp. 90-92.

[55] RR-2, p. 38; RR-3, p. 84.

04/02/2014 VOL 4261 PG 3665

had been "forged."[56] Mr. Kahn conceded he did not investigate Mr. Baggett, and appeared more remorseful that he had paid Mr. Baggett, rather than failing to recognize that Mr. Baggett was "bad," as one of his lawyers described him to Mr. Kahn.[57]

16. Mr. Baggett has been deemed incompetent to testify as a handwriting expert in numerous published court opinions, and branded a charlatan by the Dallas Court of Appeals.[58] Multiple legal opinions available in the public record before Mr. Kahn and his lawyers filed their *Ex Parte* Motion demonstrate that Mr. Baggett's affidavit would not be admissible to support Mr. Kahn's forgery allegations in this case under any theory he may claim. Judge Xavier Rodriguez, of the United States District Court for the Western District of Texas, San Antonio Division, recently excluded Mr. Baggett in *Routh v. Bank of Am., N.A.,* SA-12-CV-244-XR, 2013 (W.D. Tex. Aug. 7, 2013).[59] In *Routh,* involving property documents recorded in the Bexar County records, Mr. Baggett used language identical to the report he provided to Mr. Kahn, changing only the name of the person whose name had purportedly been forged:

> Based upon thorough analysis of these items and from an application of accepted forensic document examination tools, principles and techniques, it is my professional expert opinion that a different person authored the name of **[Kenneth E. Moore/Jennifer Baker]** on the questioned document. Someone did indeed forge the signature of **[Kenneth E. Moore/Jennifer Baker]** on the questioned document.

(emphasis added). Judge Rodriguez cited a number of cases where other courts had struck Mr. Baggett from testifying as a handwriting expert witness after finding multiple severe deficiencies with his expertise and analysis.[60]

---

[56] *See* Exhibit M to Exhibit 1.

[57] RR-2, pp. 38-39; RR-3, pp. 84-86.

[58] *See Brown v. State of Texas,* No. 05-97-00289-CR, 1999 WL 61858, at *8 (Tex. Crim. App. Feb. 9, 1999).

[59] Exhibit 11, 12.

[60]*See also, Primerica Life Ins. Co. v. Atkinson,* 2012 WL 6057888, at *4 (W.D. Wash. Dec. 6, 2012) (finding that Mr. Baggett's letter of opinion "provides no facts, reasoning, or analysis;) *Brown v. Primerica Life Ins. Co.,* No. 02-

04/02/2014 VOL 4201 PG 3666

17.     For example, in *Dracz v. American General Life*, 426 F.Supp.2d 1373 (M.D. Ga. 2006), the court struck Mr. Baggett as an expert witness finding his testimony unreliable and his qualifications "paltry" and not qualified to testify as an expert in the field of handwriting analysis.[61]  In a bench trial in *U.S. v. Revels*, 1:10-CR-110-1 (E.D. TN., May 9, 2012), the court similarly excluded Mr. Baggett pointing to his "evident deficiencies" as a handwriting expert, and referred to the Dallas Court of Appeals opinion that embraced a prosecutor's use of the term "charlatan" in reference to Mr. Baggett, which the court defined as a "pretender to medical knowledge: a quack." [62] See *Brown v. State of Texas,* No. 05-97-00289-CR, 1999 WL 61858, at *8 (Tex. Crim. App. App. Feb. 9, 1999).  The court in *Revels* also noted that Mr. Baggett had received felony convictions for theft and aggravated assault, and a deferred adjudication after pleading guilty to Tampering with a Government Record, which stemmed from his failure to truthfully disclose his criminal history on a government form.  Mr. Kahn acknowledged that legal opinions about Mr. Baggett were publicly available before he filed the *Ex Parte* Motion, but he took no steps to investigate Mr. Baggett or his background.[63]

18.     For these factual and legal reasons, and others already stated, the Court gives no weight to Mr. Kahn's persistence that forged or fraudulent documents allowed him to buy Helvetia's stock.  Mr. Kahn's additional complaints about the incorporation of Helvetia in 2007 that he claims entitled him to buy its stock in 2013 also fail, as follows.

---

C-8175, USDC, N.D. Illinois, April 29, 2006 (court struck Mr. Baggett's affidavit and excluded his testimony, finding his affidavit "unquestionably inadequate to underlie expert testimony; )  *Wheeler v. Olympia Sports Ctr., Inc.*, No. 03-265-P-H, 2004 WL 2287759 (D. Me. Oct. 12, 2004) (court excluded Mr. Baggett noting that "'comparing' the handwriting on several documents…is insufficient…Any individual, with no training or experience whatsoever, could 'compare' the handwriting on different documents and reach a conclusion;") *Abdin v. Abdin*, 94 Ark. App. 12, 223 S.W.3d 60, 65 (2006).

[61] Exhibit 13.

[62] Exhibit 14.

[63] RR-3, pp. 87-92; RR-4, p. 94.

19.     Mr. Kahn's claim that Puerto Verde did not pay $1,000 to buy the 1,000 shares of Helvetia's stock is meritless.[64] A company that pays $1.2 million to capitalize a corporation has by definition used the first $1,000 of the investment to buy the capital stock, as expressly provided for by Helvetia's organizational minutes.[65] In Helvetia's 2012 tax return, signed by Mr. Kahn, Puerto Verde's investment is accounted for as purchasing Helvetia's capital stock for $1,000, with the remainder of the investment treated by Helvetia as additional paid in capital.[66] Bearing on Mr. Kahn's credibility, Mr. Kahn claimed in Helvetia's 2012 tax return to own all of Helvetia's stock as early as 2012, even though he swore before this Court that he purchased the stock in September 2013, and that nobody owned Helvetia's stock before that time.[67]

20.     Mr. Kahn's alternative claim that Puerto Verde's $1.2 million investment was a "loan," and not capitalization of Helvetia, is baseless. Helvetia's tax return shows that Helvetia owes no loan or liability of any nature.[68] Further, Mr. Kahn could not identify any promissory note, deed of trust, or any other typical indicia of indebtedness to support his allegation.[69] In fact, closing documents on Helvetia's purchase of the Key Largo real estate reflect there was no debt.[70]

21.     When the *Ex Parte* Motion was filed on November 5, 2013, Mr. Kahn was represented by legal counsel, including Mr. George.[71] Mr. Kahn drafted the *Ex Parte* Motion

[64] RR-4, p. 93; RR-3, p. 12.

[65] Exhibit 5.

[66] Exhibit 6; *see* Schedule L, capital stock account, and additional paid-in capital account (lines 22 and 23).

[67] *Id.*; RR-3, pp. 48-56; Defendant's Exhibit 8: TI-RR-4, pp. 41-43.

[68] Exhibit 6; *see* Schedule L, liabilities (lines 16-21); RR-4, p. 40-43, 48.

[69] *Id., see also* RR-4, p. 48.

[70] Exhibit 22.

[71] Exhibit 1; RR-4, pp. 55-57; RR-3, pp. 63, 69, 81-82; Defendant's Exhibit 8: TI-RR-3, pp. 61-62.

04/02/2014 VOL 4261 PG 3568

and directed his lawyers to file it.[72]  Without any authority, Mr. Kahn filed the pleading in the name of Helvetia, and falsely asserted his ownership of Helvetia throughout the filing, which he reiterated in his supporting affidavit.[73]  Mr. Kahn's affidavit, containing his allegations of fraud and forgery against Puerto Verde, was later "massaged" by Mr. Petterson, who Mr. Kahn retained just days before he filed the *Ex Parte* Motion.[74]

22.    In the *Ex Parte* Motion, Mr. Kahn sought to have six warranty deeds executed by Helvetia declared invalid.[75]  The six warranty deeds represented Helvetia's six sales of lots to a homebuilder in September and October 2013, after it had terminated Mr. Kahn.[76]  Mr. Kahn claimed that because he bought Helvetia's stock on September 7, 2013, after he was terminated, only he, and not the person signing the deeds, had the authority to sell Helvetia's lots.[77]

23.    Mr. Kahn and his attorneys knew or should have known that Section 51 of the Texas Government Code only affords the extraordinary remedy of *ex parte* relief to "owners" of real property.[78]  Mr. Kahn did not meet this requirement.[79]  He did not personally own any of the six lots, he did not own Helvetia, and he had no relationship with Helvetia at the time the *Ex Parte* Motion was filed.[80]

---

[72] *Id.*; RR-4, pp. 55-57; Defendant's Exhibit 1 (Attorney Employment Agreement with Mr. Petterson, dated November 11, 2013, effective November 1, 2013).

[73] Exhibit 1; *see also,* Mr. Kahn's Affidavit attached as Exhibit 1 to the *Ex Parte* Motion.

[74] RR-4, pp. 55-57; Defendant's Exhibit 1.

[75] Exhibit 1, pp. 2-4, § IV.

[76] *Id., see also,* Exhibits A-F attached to Exhibit 1.

[77] Exhibit 1; Mr. Kahn's affidavit attached as Exhibit 1 to Exhibit 1.

[78] *See* TEX. GOV'T CODE ANN. § 51.903.  An obligor or debtor of the real property may also bring an action under these proceedings, but Mr. Kahn sought relief only as an "owner."  Mr. Kahn makes no claim that he is either an obligor or debtor of the six lots at issue.

[79] RR-4, pp. 43-46; Exhibits 23 and 24.

[80] *Id.*

24.  Section 51.903 also limits the Court's determination to whether the six warranty deeds are fraudulent as defined by section 51.901, and does not provide for findings by the Court on the parties' underlying dispute.  *See* TEX. GOV'T CODE ANN. § 51.903(a), (g).  *See In re Purported Liens or Claims Against Samshi Homes, L.L.C.*, 321 S.W.3d 665, 667 (Tex.App.-Houston [14th Dist.] 2010, no pet.); *Becker v. Tropic Isles Ass'n*, No. 13-08-00559-CV, 2010 WL 877569, at *3 (Tex.App.-Corpus Christi Mar. 11, 2010, pet. denied) (mem. op.); *In re Hart*, No. 07-98-0292-CV, 1999 WL 225956, at *2 (Tex.App.-Amarillo Apr. 15, 1999, no pet.).[81]  This statute was enacted after the Republic of Texas filed hundreds of frivolous liens against government officials.[82]

25.  Due to the extraordinary *ex parte* nature of the proceedings, Section 51.903(a) of the Texas Government Code requires the verified motion recite that the movant is aware that sanctions will be imposed for a frivolous filing.  The *Ex Parte* Motion contained this recitation.[83]

---

[81]Section 51.903 was enacted as part of House Bill 1185, passed in 1997. *See* Act of May 10, 1997, 75th Leg., R.S., Ch. 189, § 14, sec. 51.903, 1997 TEX. SESS. LAW. SERV. 1045, 1053 (current version at TEX. GOVT. CODE ANN. § 51.903 (Vernon 2005)).

The Senate's Bill Analysis explains the impetus behind the passage of Bill 1185, as follows:

> Currently, individuals and organizations have begun to take action based on their refusal to recognize the authority and sovereignty of the government of the State of Texas.  These entities have filed fraudulent judgment liens issued by so-called "common law courts" and fraudulent documents purporting to create liens or claims on personal and real property with the secretary of state and many county and district court clerks throughout the state.  Many of the filings have been against the State of Texas and public officers and employees, as well as private individuals.  These filings have clogged the channels of commerce and have amounted to harassment and intimidation of both public officials and ordinary citizens.  This bill provides both civil and criminal remedies for those against whom such fraudulent filings have been made. . . .  This bill creates an expedited judicial process that permits someone aggrieved by the fraudulent filing to obtain an expedited legal process to obtain a court order declaring the filing to be fraudulent. . . .

SENATE RESEARCH CTR., BILL ANALYSIS, TEX. H.B. 1185, 75TH LEG., R.E. (1997) (emphasis added).  Thus, the bill analysis supports the view that the statute was not created to determine the legitimacy and validity of the claimed interest in the property.

[82] Texas Attorney General's summary: https://www.texasattorneygeneral.gov/alerts/alerts_view.php?id=114&

[83] Exhibit 1, p. 5.

04/02/2014 VOL 4261 PG 3570

Accordingly, both Mr. Kahn and his counsel were aware that a false filing would or could result in an assessment of sanctions.

26.     The language and the suggested form of a motion brought under § 51.903 are contained within the statute itself. The language in Mr. Kahn's *Ex Parte* Motion extended far beyond the statute. First, these motions can only be brought by property owners, and as shown herein Mr. Kahn neither owned Helvetia, nor had any right or interest in Helvetia that would permit him to bring a § 51.903 action. Second, the *Ex Parte* Motion and the *Ex Parte* Order impermissibly sought and obtained partial findings by the Court on the merits of the parties' dispute, and in particular Mr. Kahn's allegations that documents were forged or fraudulent.[84]

**D.**     **Mr. Kahn's Delay Tactics to Maintain Cloud on Helvetia's Lots and Increase Costs.**

27.     Upon learning of the *Ex Parte* Order, Helvetia immediately sought Court assistance, setting its November 8, 2013 Emergency Motion to Set Aside *Ex Parte* Order and for Sanctions (the "Emergency Motion") for hearing on November 15, 2013. Mr. Kahn, along with Mr. Petterson, and Mr. Kahn's additional new attorney, Kathleen Cassidy Goodman, appeared at the Presiding Court for the hearing. The hearing did not take place. Instead, the parties entered

---

[84] Exhibit 1, pp. 2-5; and Mr. Kahn's affidavit, attached as Exhibit 1 to Exhibit 1, are composed almost entirely of Mr. Kahn's allegations about the merits of the parties' underlying dispute, with the Ex Parte Motion in sharp variance with the "suggested form" found in § 51.903(a). *See also* Exhibit 2 and its reference to forged corporate documents.

"Unsubstantiated factual conclusions appearing in an affidavit are not competent evidence." *In re a Purported Lien or Claim Melissa Kay Bishop*, No. 07-00455-CV, (Tex. App. Amarillo, Dec. 4, 2013, n.p.h.), citing *Tex. Division – Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994).

On February 24, 2014, the Amarillo Court of Appeals in *Melissa Kay Bishop* entered a judgment itself, pursuant to its opinion reversing the trial court's findings that Bishop's lender's lien was fraudulent, and TEX. R. APP. P. 43.2(c), decreeing that:

> [T]he findings and conclusions executed by the trial court are reversed and **ordered to be a nullity**. It is further ordered that the Motion for Judicial Review of Documents or Instruments Purporting to Create a Lien or Claim is denied. (emphasis added)

04/02/2014  VOL 4201  PG 3571

into and filed of record their Rule 11 agreement. [85] The Rule 11 Agreement provided, among other things, to set aside the *Ex Parte* Order by submitting an agreed order to that effect within seven days.[86]

28.     On November 22, 2013, Mr. Kahn fired Mr. Petterson and Ms. Goodman and substituted himself as counsel pro se.[87]  Mr. Kahn refused to execute the documents prepared by Helvetia to effectuate the Rule 11 agreement.  Mr. Kahn has since asserted in pleadings and testimony that Helvetia's lawyers either bribed or coerced his lawyers into signing the Rule 11 Agreement.[88]  Though Mr. Kahn claims he did not expressly authorize the signing of the Rule 11 Agreement, the Court finds no evidence that his attorneys lacked implied or apparent authority to sign the Rule 11 agreement.  The Court finds no evidence to support the claim that opposing counsel bribed or coerced Mr. Kahn's counsel into signing the Rule 11 agreement.

29.     Mr. Kahn created additional delay when he appeared at the resetting of Helvetia's Emergency Motion, and its Motion to Enforce Rule 11 Agreement, on November 26, 2013 with two new lawyers, seeking a continuance.  Judge Peter Sakai granted a continuance, but also entered a TRO restraining Mr. Kahn from taking any actions on behalf of either Helvetia or Paradiv, and setting the hearing on the temporary injunction for December 6, 2013.  Judge Sakai found in the TRO that further attempts by Mr. Kahn to claim title to Helvetia's properties and

---

[85] Defendant's Exhibit 8: TT-RR-4, pp. 75, 77, 83-85, 87-90.

[86] Pertinent language of the Rule 11 Agreement states:

    2.    The parties shall execute documents within the next 7 days sufficient to implement the following:

        a.    Agreed Order setting aside the judgment of November 5, 2013, in cause 18384.

        b.    A complete release and hold harmless by Burton Kahn...of any claim of ownership or title to the 6 lots at issue in Cause No. 18394.

[87] Court records do not show that Mr. George was ever discharged from his representation of Mr. Kahn in either this case or Cause No. 18355, although the Court discharged him in an least one related action, Cause No. 17016, with Mr. Kahn's approval.

[88] RR-2, p. 53; RR-3, p. 30.

04/02/2014 VOL 4261 PG 3372

ownership of Helvetia would immediately make Helvetia substantially less valuable, causing irreparable harm. The TRO ordered expedited discovery from Mr. Kahn and Mr. George, including their deposition and document production. Mr. Kahn then fired those two new lawyers and hired Robert Wachsmuth and Zachary Fanucchi, who handled the Temporary Injunction hearing.[89]

30.    Despite Judge Sakai's TRO, Mr. Kahn promptly filed a counterclaim against Helvetia on December 2, 2013 in Cause No. 18355 claiming that he owned Helvetia and was entitled to all revenues it had earned after it had fired him on August 26, 2013. He also sought in his verified pleading a declaration that he was the rightful owner of Helvetia and its assets, and a TRO restraining Mr. Ripley from selling further lots that Mr. Kahn claimed he owned as "sole owner of Helvetia."[90] Mr. Kahn and Mr. Wachsmuth also filed a second set of motions to quash the depositions of Mr. Kahn and Mr. George, noticed for December 4, 2013, making it impossible for Helvetia to take their depositions before the December 6 temporary injunction hearing set by Judge Sakai.[91]

31.    Helvetia sought immediate relief for Mr. Kahn's attempt to once again delay the sanctions hearing and setting aside the *Ex Parte* Order and his repeated attempts to prevent Helvetia from obtaining discovery. On December 5, 2013, Judge David Canales entered a ruling on another emergency motion filed by Helvetia that ordered Mr. Kahn and Mr. George to appear with documents for their depositions at the Bexar County Courthouse on Friday, December 6, and moved the hearing on Helvetia's temporary injunction to Monday, December 9. Judge Canales also set aside the matters Mr. Kahn had set for hearing on December 6 to a date after the

---

[89] The Court takes judicial notice of these facts from the files of Cause No. 2013-CI-18355.

[90] *Id.*

[91] *Id.*; Mr. Kahn and Mr. George had earlier refused to appear for their noticed depositions by filing motions to quash on November 12, 2013.

Court had fully adjudicated Helvetia's temporary injunction, its sanctions request, and its request to enforce the Rule 11 Agreement. Judge Canales declined at that time to make any contempt findings, but expressly recognized in his order that Mr. Kahn had violated Judge Sakai's TRO, that he had refused to implement the November 15, 2013 Rule 11 Agreement, and that he and Mr. George had failed to produce documents or appear for depositions as Judge Sakai had ordered. Helvetia deposed Mr. Kahn on December 6; Mr. George did not appear for his deposition though ordered to do so.[92]

32.     Mr. Wachsmuth and Mr. Fanucci represented Mr. Kahn during the three-day evidentiary hearing that culminated on December 11, 2013 with Judge Karen Pozza granting Helvetia's application for a Temporary Injunction enjoining Mr. Kahn from taking further actions on behalf of Helvetia and Paradiv.[93] Judge Pozza also set aside the *Ex Parte* Order.[94] Mr. Kahn then fired Mr. Wachsmuth and Mr. Fanucci on December 13, 2013, and has since been pro se.

33.     Helvetia set its First Amended Motion for Sanctions for hearing on January 21, 2014. Both Mr. Kahn and Mr. George appeared at the Courthouse on January 21 for the sanctions hearing. The presiding court assigned all of the parties' pending matters pending in Cause Nos. 18394 and 18355 to the Monitoring Court, and all counsel and Mr. Kahn met with the Monitoring Court Clerk about scheduling and resetting the hearings to March 3, 2014.[95]

---

[92] *Id.*

[93] *Id.*; an Amended and Supplementary Temporary Injunction was entered by Judge Pozza on **December 18, 2013** that expressly permitted Helvetia to continue selling its lots.

[94] Exhibit 3.

[95] *Id.*

04/02/2014 VOL 4201 PG 3374

## II.
### ORDER OF SANCTIONS

34.     Helvetia has provided evidence that overcomes the general presumption by courts that pleadings and other papers are filed in good faith.

35.     As discussed herein, the conduct by Mr. Kahn and Mr. George in failing to conduct appropriate investigation and due diligence before filing the *Ex Parte* Motion, in delaying efforts by Helvetia to set it aside, and in refusing to comply with the Rule 11 Agreement, show that their pleading and their conduct has been groundless, that the pleading was filed in bad faith and for harassment, that it was filed for an improper purpose, that it lacked in factual or legal basis, and was not supported by evidence. These findings are incorporated into the Court's findings that sanctions are appropriate under Rule 13, Chapter 10, § 51,903, and under the Court's inherent power, as described in this order and judgment.

### A.     Ruth 13, Texas Rules of Civil Procedure

36.     Rule 13 gives the Court the option of imposing sanctions on both a party and counsel for filing a groundless pleading that is either brought in bad faith or brought for the purpose of harassment. TEX. R. CIV. P. 13; *In re C.M.V.*, 136 S.W.3d 280, 284 (Tex. App. – San Antonio 200, no pet.) The rule defines "groundless" as having "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law," and thus turns on the legal merits of a claim. *Id.; Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex. App.-Austin 2008, pet. denied). "Bad faith" requires the conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose. *Id.*, at 407. Improper motive is an essential element of bad faith. *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 669 (Tex.App.-Dallas 2003, no pet.). Rule 13 also provides, "[S]anctions under this rule may not be imposed except for good

cause, the particulars of which must be stated in the sanction order." *See Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).

37.     Rule 13 permits the trial court to impose sanctions on attorneys or parties who file a "fictitious pleading" or "make statements in pleading which they know to be groundless and false." After notice and hearing, the trial court "shall impose an appropriate sanction" available under Rule 215. TEX. R. CIV. P. 13.

38.     Sanctions available under Rule 215.2(b) include attorney's fees. See TEX. R. CIV. P. 13, 215.2(b).  Sanctions awarded as attorney's fees fall within the sound discretion of the Court. *Olibas v. Gomez*, 242 S.W.3d 527, 535 (Tex. App.-El Paso 2007, pet. denied); *Glass v. Glass*, 826 S.W.2d 683, 688 (Tex. App.-Texarkana 1992, writ denied) (citing *Brantley v. Etter*, 677 S.W.2d 503, 504 (Tex. 1984)).

39.     In determining whether sanctions are appropriate, the trial court examines the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Alejandro v. Bell*, 84 S.W.3d 383, 392 (Corpus Christi 2002, no pet. h.); *Home Owners Funding Corp. of Am. v. Scheppler*, 815 S.W.2d 884, 889 (Tex. App. – Corpus Christi 1991, no writ). The Court also considers the acts or omissions of the represented party or counsel, not merely the legal merit of a pleading or motion. *Griffin Indus. V. Grimes*, No. 04-02-00430-CV, 2003 WL 1911993, *4 (San Antonio Apr. 23, 2003, no pet.) (citing *New York Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 856 S.W.2d 194, 205 (Tex. App.--Dallas 1993, no writ.).

40.     In addition, the Court is entitled to evaluate the credibility of the testimony and determine what weight to give it. *Wein v. Sherman*, 03-10-00499-CV, 2013 Tex. App. Lexis 10666, at *24 (Tex.App.-Austin Aug. 23, 2013, n.p.h.) (mem. op.) (*citing Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 412 (Tex.App.-Houston [1st Dist.] 2005, pet. denied)).

04/02/2014 VOL 4201 PG 3376

41.     The Court has made the necessary factual determinations about the motives and credibility of Mr. Kahn. The Court finds that sanctions against Mr. Kahn are appropriate under Rule 13. The Court is precluded from sanctioning Mr. George under a literal reading of this Rule because his associate attorney, not Mr. George, signed the *Ex Parte* Motion. *Yuen v. Gerson*, 342 S.W.3d 824 (Tex. App. – Houston [14th Dist.] 2011, pet. denied).

42.     Helvetia has not sought sanctions against the associate attorney, Mr. Petterson. Although Mr. Petterson signed the offending pleading, Mr. Petterson attempted to rectify the error within ten days by entering into the Rule 11 Agreement.

**B.      The *Ex Parte* Motion Was a Fictitious Pleading And is Groundless.**

43.     The Court finds that the *Ex Parte* Motion was a fictitious pleading and groundless, and that it was brought both in bad faith and for harassment. The *Ex Parte* Motion has no basis in law or fact, and is not warranted by good faith argument for the extension, modification, or reversal of existing law.[96] Mr. Kahn filed the pleading maliciously without any basis in fact or law.[97] Mr. Kahn also filed it as an experiment to obtain an opinion of Helvetia ownership that he could then use to bolster his egregious ownership arguments in this matter.

44.     The Court has assessed Mr. Kahn's credibility along with the evidence presented, and finds there is not a scintilla of evidence that Mr. Kahn owns Helvetia's stock, and thus finds the *Ex Parte* Motion meritless. The Court finds that Mr. Kahn has used this false allegation for improper purposes, and thus finds good cause in assessing sanctions as further particularized herein. His wrongful claims of ownerships were at the genesis of all of the proceedings herein, and spawned the litigation between the parties, unnecessarily causing Helvetia to incur substantial fees and expenses.

---

[96] RR-3, p. 93-95.

[97] RR-3, pp. 101.

04/02/2014 VOL 4201 PG 3577

45.    By claiming Mr. Kahn owned the property owner, and thus had standing to bring an action under § 51.903 of the Texas Government Code, Mr. Kahn and Mr. George made factual contentions that lacked any legal or evidentiary support. The claim of a forged stock certificate was factually bogus and legally irrelevant.

46.    The *Ex Parte* Motion also exceeded the scope of §§ 51.901 and 51.903 of the Texas Government Code by seeking and obtaining extraneous findings as discussed herein.

47.    Mr. Kahn appears to challenge the Court's findings based on either the United States Constitution or the Texas Constitution. Although not clearly articulated, his challenges are not relevant here because the Court has based its findings on non-constitutional grounds.[98]

**C.    The *Ex Parte* Motion was Filed In Bad Faith and for Harassment.**

48.    The Court finds that bad faith was demonstrated in that there was a conscious doing of a wrong for a dishonest or malicious purpose. The *Ex Parte* Motion constituted harassment in that it was intended to annoy, alarm, and abuse another person. The Court finds that the *Ex Parte* Motion was filed:

a.    To avoid the probable and imminent entry of a TRO against Mr. Kahn;

b.    To maliciously "cloud the title" of the six lots, and thus to interfere and harm Helvetia's business by Mr. Kahn's claim that he owned property that Helvetia had already sold to builders;

c.    To chill Helvetia's future sales of property, as Mr. Kahn acknowledged he knew the litigation would make builders, lenders and title companies reluctant to close

---

[98] See *In re Hart*, No. 07-98-0292-CV, 1999 WL 225956, at *2 (Tex. App.-Amarillo Apr. 15, 1999, no pet.) (Court declined to address Harts' complaint that **§ 51.903 of the Texas Government Code** was unconstitutional, citing *San Antonio Gen. Drivers v. Thornton,* 156 Tex. 641, 647, 299 S.W.2d 911, 915 (1957), which directs a court not to pass upon the constitutionality of a statute if the particular case can be decided upon non-constitutional grounds).

04/02/2014 VOL 4201 PG 3378

on property sales by Helvetia if they thought Mr. Kahn would record adverse ownership claims to the property;

d.    To attempt to extort revenues earned by Helvetia after it had terminated Mr. Kahn's employment;

e.    To retaliate or "get even" against his former employer.

49.    Mr. Kahn acted with duplicity, defrauding the Court as shown herein, and defrauding Helvetia.[99]

50.    The timing of Mr. Kahn's filing of the *Ex Parte* Motion also shows bad faith and filing for an improper purpose. Email exchanges show that Helvetia sued Mr. Kahn on November 4, 2013 for various torts and injunctive relief, and were attempting to coordinate with Mr. George a time to present to the Court Helvetia's application for a temporary restraining order.[100] These types of games with the Court and opposing counsel go to the Court's core functions, and subject Mr. Kahn and Mr. George to sanctions under the Court's inherent power to control litigants.

51.    Mr. Kahn's pleadings and conduct demonstrate delay when he avoided the hearing to set aside the *Ex Parte* Order by agreeing to, and later reneging, on the Rule 11

---

[99] Defendant's Exhibit 8: TI-RR-4, pp. 82-83 ("Paradiv doesn't own [the six lots], it is Helvetia. And Paradiv was only – the only reason why I made that transaction [the Ex Parte Motion], was to try to prevent Robert Ripley from – he sold six lots when he wasn't even…president of the company.")

[100] RR-3, pp. 95-101; Exhibits 15-18.

*Helvetia Asset Recovery, Inc. v. Burton Kahn and Paradiv Corporation,* filed on November 4, 2013, in the 407th Judicial District, Bexar County, Texas.

On November 4, 2013, counsel for Helvetia emailed Mr. Kahn's lawyer, Mr. George, a newly filed petition and application for injunctive relief seeking to enjoin Mr. Kahn from taking further action on behalf of Helvetia, referring to his attempts to convey Helvetia's property to Paradiv. The email requested that Mr. George provide a convenient time for a court appearance on November 5 if he intended to contest Helvetia's request for a temporary restraining order. Mr. George offered no specifics but noted that Mr. Kahn had engaged a San Antonio attorney, Jay Petterson, as associate counsel.

Agreement.[101] Further delay occurred on November 26, 2013 when Mr. Kahn and new counsel *de jour* sought and obtained a continuance, falsely claiming the new counsel needed to get up to speed. Mr. Kahn fired those lawyers the same day, showing grounds for the continuance were a pretext for simply more delay. The refusal by Mr. Kahn and Mr. George to comply with Helvetia's deposition notices on November 12, 2013, and their outright violation of Judge Sakai's orders for the same, demonstrate further delay. Mr. Kahn's voluminous pleadings on December 2, 2013 constitute further materially bad faith conduct and harassment when they set numerous substantive motions for hearing on the day Judge Sakai set Helvetia's temporary injunction for hearing. Their continued refusal to present themselves for deposition caused further delay and unnecessary expense, leading to Judge Canales' December 5, 2013 order to appear, in which he also expressly stated Mr. Kahn was already in violation of the TRO by his acts purporting to be on behalf of Helvetia.

52.     Mr. Kahn's attempt to trivialize his conduct is not creditable given the unrelenting efforts he took to keep his fraudulent claim intact on the six lots, through the date Judge Pozza set it aside on December 8, 2013. Moreover, by failing to release the fraudulent lien after demand was made by Helvetia, the Court may presume Mr. Kahn had the intent to harm and defraud Helvetia and others. Mr. Kahn claims he rightfully reneged on the Rule 11 Agreement, but by doing so he refused Helvetia's demand to release the lien, thus giving rise to such a presumption of intent.[102]

---

[101] RR-3, pp. 101-104.

[102] *See Florance v. State*, No. 05-08-00984-CR (Tex. App. – Dallas, Aug. 28, 2009). The Florance Court affirmed a judgment that Florance was guilty, after jury trial, and affirmed his sentence of six months in jail for Florance's failure to release a lien that was fraudulent under § 51.901, Tex. Gov't Code, in violation of Tex. Penal Code § 32.49.

53. Mr. Kahn and Mr. George filed the *Ex Parte* Motion in bad faith, as it demonstrated a conscious doing of a wrong for a dishonest and malicious purpose. Their actions were taken in part to slander title, and to make it difficult or impossible for Helvetia to continue its sales of lots. Their intent to harm Helvetia in this manner showed an improper motive. Mr. Kahn's testimony demonstrated his subjective state of mind: he knew, and intended, for the filing to stop Helvetia from further lot sales.[103]

54. Mr. Kahn has openly admitted his motivation in filing the *Ex Parte* Motion was to interfere with Helvetia and to stop further sales of lots. Mr. Kahn is knowledgeable about title companies and title searches, and intended his conduct to chill Helvetia's future sales of its property.[104]

55. Mr. Kahn knew or should have known, by proper investigation, that Mr. Moore's signature was not forged, and that Mr. Baggett was not reputable and could not reasonably provide an opinion contrary to Mr. Moore's own testimony.

56. The Court can infer Mr. Kahn was additionally motivated by retaliation or vindication, or part of a strategy to cause Helvetia to expend more fees and costs and drive it to the settlement table.

57. Mr. Kahn was motivated to claim ownership of Helvetia because after he was fired, his direct access to all revenues earned by Helvetia from lot sales was cut off.

**D.**     **Chapter 10, Tex. Civ. Prac. & Rem. Code, and § 51.903, Texas Government Code.**

58. Chapter 10 authorizes a court to impose sanctions upon a person, or a party represented by the person, where an attorney files a groundless pleading or files a pleading for an improper purpose, including to harass. TEX. CIV. PRAC. & REM. CODE §§ 10.001(1-3),

---

[103] RR-3, p. 27.

[104] *Id.*; *see also*, RR-3, pp. 38; RR-4, pp. 57-62; Exhibit 26 and 27.

04/02/2014 VOL 4201 PG 3281

10.004(a). Each allegation and factual contention in a pleading or motion must have, or be likely to have, evidentiary support after a reasonable investigation. *Id., see also, Bravenec v. Flores*, No. 04-11-00444-CV, San Antonio, Mar. 20, 2013, citing *Low v. Henry*, 221 S.W.3d 609, 614-15 (Tex. 2007). "A trial court may impose sanctions against a party if the court finds that the party has failed to comply with this requirement." *Bravenec, citing Nolte v. Flournoy*, 348 S.W.3d 262, 269 (Tex. App. – Texarkana 2011, pet. denied).

59.     Chapter 10 thus permits the Court to sanction a party or an attorney for filing pleadings that lack a reasonable basis in law or fact. See TEX. CIV. PRAC. & REM. CODE § 10.001-.006; *Low*, 221 S.W.3d at 614. The Court may impose sanctions if the Court finds that the party has failed to comply with any one of the requirements of Section 10.001 of the Texas Civil Practices & Remedies Code. TEX. CIV. PRAC. & REM. CODE § 10.004(a); *Nolte*, 348 S.W.3d at 269.

60.     For reasons previously described, and incorporated by reference, sanctions may be imposed against Mr. Kahn under Chapter 10 of the Texas Civil Practices and Remedies Code. The evidence shows that Mr. Kahn and Mr. George are both culpable and that both should be sanctioned for their conduct but as with Rule 13 the Court is precluded from assessing sanctions against Mr. George.

61.     More particularly, the *Ex Parte* Motion was filed for an improper purpose, and it lacks any evidentiary support as shown herein. Section 51.903 builds in an award of sanctions if a party seeks a finding not in compliance with the statute; Mr. Kahn and Mr. George orchestrated the hearing to be ex parte despite Helvetia's contemporaneous attempts to secure a hearing on a TRO that would have precluded Mr. Kahn's filing; Mr. Kahn filed the pleading without any authority; and his ownership claims are neither factually or legally supported.

04/02/2014 VOL 4201 PG 3882

### E. Court's Inherent Power to Sanctions

62. The Court has inherent power to impose sanctions. Assessing sanctions under this inherent power involves a two-step process: (1) the Court should rely upon the rules and statutes expressly authorizing sanctions whenever possible, and (2) the Court, applying its inherent power to impose sanctions, must make factual findings, based on evidence, that the conduct complained of significantly interfered with the Court's legitimate exercise of its core functions. Inherent power to sanction exists where necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of the Court. Core functions include hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgments and enforcing judgments. Core functions also include management of its docket and the issuance and enforcement of its orders. The Court "may issue orders and, when it deems appropriate, vacate, rescind, or modify those orders. Lawyers and the litigants do not have such authority."[105] By doing so they effectively usurp the Court's role and displace the Court as the decision-maker, thus interfering with a core function of the Court.

63. For reasons and findings previously discussed, sanctions are appropriate against both Defendants under this Court's inherent powers. Their Ex Parte Motion and ex parte hearing interfered with most of the Court's core functions. They submitted evidence not allowed by § 51.903; they made arguments and submitted an improper order under § 51.903 that affected the Court's decision-making; and they omitted disclosing to the Court prior proceedings detrimental to their legal position. Mr. Kahn also ignored the Court's setting aside of the Ex Parte Order,

---

[105] *Basaldua v. Forest Woods Subdivision*, No. 04-11-00716-CV (Tex. App. San Antonio, July 5, 2012 (citing *In re K.A.R.*, 171 S.W.3d 705, 715 (Tex. App. – Houston [14th Dist.] 2005, no pet.).

thus attempting to usurp the Court's role, by continuing to assert the same grounds that were contained in the order that had been set aside.

64.     Both Mr. Kahn and Mr. George are culpable for the groundless *Ex Parte* Motion, and their allegations that Mr. Kahn reasonably could have purchased any asset valued over $1,000,000 for $1,000. The pleading is based solely on Mr. Kahn's allegations that Helvetia had never issued its stock to Puerto Verde, thereby allowing him to buy the company, worth over $1 million, for $1,000, and only days after the company had terminated him for misconduct. Both Mr. Kahn and Mr. George participated in the 2007 incorporation of Helvetia, and Mr. Kahn additionally participated in the transaction by which Puerto Verde wired $1.2 million in cash to capitalize Helvetia. Mr. George was the incorporator for Helvetia and prepared its 2007 organizational minutes showing that Puerto Verde would be issued all 1000 shares of Helvetia's stock at $1 per share. Mr. Kahn testified that he was knowledgeable about property sales, and knew that a cloud on a title generally would preclude a sale of that parcel. He intended for the *Ex Parte* Motion to harm Helvetia's sales, which he believed would return the parties to "status quo." Mr. Kahn drafted the pleading and his affidavit, and located and hired a handwriting expert. At the time that the *Ex Parte* Motion was filed, Mr. Kahn provided the factual basis for the claims, and decided what legal claims to assert, and the manner in which to assert them, via the Texas Government Code. As part of his claim that he owned Helvetia, Mr. Kahn created the new corporation Paradiv, to which he had tried to convey all of Helvetia's property in Key Largo only days and weeks before he filed the *Ex Parte* Motion that sought to invalidate legitimate sales closed by Helvetia after it had terminated Mr. Kahn.

65.     Mr. George did not sign the *Ex Parte* Motion, but delegated that task to the newly retained local counsel Mr. Petterson. Emails on November 4 and 5, 2013 show that Helvetia's

counsel was unaware of Mr. Petterson's representation until the day the *Ex Parte* Motion was filed, November 5. After ignoring orders by Judge Sakai and Judge Canales to appear for his deposition, Mr. George voluntarily appeared at the December 2013 hearing before Judge Pozza to provide testimony during Mr. Kahn's presentation of his case. Nothing in the evidence shows that Mr. George disavowed the Parte Motion.

66.     Mr. George had notice of the sanctions motion and hearing set for March 3, 2014. He appeared on January 21, 2014, a previous setting, and participated in the monitoring court's reset of the hearing to March 3, 2014.[106]

F.     **Sanctions are Just and Not Excessive**

67.     The Court has carefully examined the two-part test adopted by the Texas Supreme Court in finding that the sanctions assessed are just. First, there is a direct nexus among the offensive conduct, the offender, and the sanction imposed, in that the sanction is directed against the abuse and toward remedying the prejudice caused the innocent party.

68.     Second, the sanction is not excessive because it is no more severe than necessary to satisfy its legitimate purposes, here, namely, to deter other litigants from similar misconduct and punish violators.[107]

Accordingly, it is hereby ORDERED, ADJUSTED AND DECREED as follows:

(1)     Sanctions be and hereby are awarded against Burton Kahn and Terry George, jointly and severally, in the amount of $253,416.00, for which let execution issue. Of this sum, the Court finds $153,416.00 to be reasonable attorneys' fees incurred by Movants as a direct and proximate result of the fictitious filings and the attempted withdrawal of the Rule 11 agreement.

---

[106] RR-4, pp. 54-55.

[107] Exhibits 29 and 30.

The remaining $100,000.00 is imposed as sanctions for lack of diligence into the facts and the law.

(2)     All other relief not expressly granted hereby is denied.  The Court's intent is that this instrument be in all things a Final Judgment and Order.

SIGNED, ORDERED, and ENTERED this *1st* day of *April*, 2014.

_____
JUDGE PRESIDING

Submitted by:

HAYNES AND BOONE, LLP

_____/s/ Werner A. Powers_____
Werner A. Powers
State Bar No. 16218800
Natalie DuBose
State Bar No. 24077481
2323 Victory Avenue, Suite 700
Dallas, Texas  75219
Telephone:  (214) 651-5000
Telecopier:  (214) 651-5940

Lisa S. Barkley
State Bar No. 17851450
112 E. Pecan, Suite 1200
San Antonio, Texas 78205
Telephone No. : (210) 978-7427
Telecopier No. : (210) 554-0427

ATTORNEYS FOR
HELVETIA ASSET RECOVERY, INC.

04/02/2014  VOL 4261  PG 3286